IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JOHN PATELLA, a sole proprietor doing business as "LittleJohn's" and doing business as "Platinum;" TERRY SMITH KING, a sole proprietor doing business as "Roosters;" and JONATHAN MAURICE BROWN, a sole proprietor doing business as "Big Time Barbershop; on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>vs.<br><br>PEOPLE'S REPUBLIC OF CHINA; THE COMMUNIST PARTY OF CHINA; NATIONAL HEALTH COMMISSION OF THE PEOPLE'S REPUBLIC OF CHINA; MINISTRY OF EMERGENCY MANAGEMENT OF THE PEOPLE'S REPUBLIC OF CHINA; MINISTRY OF CIVIL AFFAIRS OF THE PEOPLE'S REPUBLIC OF CHINA; PEOPLE'S GOVERNMENT OF HUBEI PROVINCE, PEOPLE'S GOVERNMENT OF CITY, WUHAN INSTITUTE OF VIROLOGY; and CHINESE ACADEMY OF SCIENCES,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No. 1:20-cv-00433<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **COMPLAINT**

   1.  Plaintiffs, on behalf of themselves and all those similarly situated, by and through his undersigned counsel, hereby sue the named Defendants (collectively "Defendants") for damages, and further allege as follows:

## **INTRODUCTION**

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 1 of 45

2. This is class action brought by the named Plaintiffs, individuals and business owners in the State of North Carolina, for damages suffered as a result of the Coronavirus pandemic, against Defendants, the People's Republic of China and its various government entities overseeing the response to the Coronavirus pandemic in China generally and within Hubei Province and the City of Wuhan particularly.

3. The world has been devastated in recent days by the ongoing spread of the new strain of the Coronavirus, more commonly known as COVID-19. The virus began in Wuhan, Hubei Province, China in December 2019, and has quickly spread throughout Asia, Europe and, North America.

4. The PRC and the other Defendants knew or had reason to know that COVID-19 was dangerous and capable of causing a pandemic, yet slowly and negligently acted, and/or engaged in a systematic cover-up for their purposes.

5. The conduct of Defendants has caused injury and incalculable harm to be named Plaintiffs and the putative class members, and such injury and harm will only multiply in coming days and weeks. The Defendants' conduct has caused and will continue to cause personal injuries and deaths, as well as other damages.

6. COVID-19 has left no community in the world untouched.

7. This COVID-19 pandemic is the direct result of a campaign of malfeasance and deception carried out by Defendants.

8. Defendants, in violation of their duties to the international community, engaged in inherently dangerous activities that imperiled the lives and health of millions.

9.     When their actions began to kill hundreds of thousands of people across the globe, Defendants sought to minimize the consequences, engaging in a cover-up and a misleading public relations campaign by censoring scientists, ordering the destruction and suppression of valuable research, and refusing cooperation with the global community, all in violation of international   health standards.

10.     Defendants' actions and inactions had profound effects in North Carolina, and the same have adversely affected every citizen of the State of North Carolina.

11.     This civil action seeks to hold Defendants accountable for the extraordinary public-health crisis that they created and to allow named Plaintiffs and all those similarly situated to recoup the damages which they have suffered as a result of Defendants' actions and inactions.

## PARTIES

12.     Plaintiffs are citizens and residents of Forsyth County, North Carolina, and they own and operate businesses for profit as sole proprietors.  As individuals and business owners, Plaintiffs have suffered direct and substantial damages proximately caused by Defendants as is hereinafter alleged.

13.     The putative members of the class consist of all of the citizens and residents of the State of North Carolina who have been physically injured or who have suffered economic harm as a result of the COVID-19 pandemic.

14.     Defendant People's Republic of China ("PRC" or "China") is a communist nation in Asia.

15.     Defendant Communist Party of China ("CPC" or "Communist Party") is the sole governing party within China, and the Communist Party's General Secretary becomes the president of the PRC.

16.     On information and belief, the Communist Party is not an organ or political subdivision of the PRC, nor is it owned by the PRC or a political subdivision of the PRC, and thus it is not protected by sovereign immunity. *See, e.g., Yaodi Hu v. Communist Party of China,* 2012 WL 7160373, at *3 (W.D. Mich. Nov. 20, 2012) (holding that the Communist Party of China is not entitled to immunity under the Foreign Sovereign Immunities Act).

17.     On information and belief, at all relevant times, the Communist Party exercised direction and control over the actions of all other Defendants.

18.     Defendant National Health Commission of the People's Republic of China ("National Health Commission") is a ministry of the PRC's State Council charged with formulating health policies.

19.     Defendant Ministry of Emergency Management of the People's Republic of China ("Ministry of Emergency Management") is a ministry of the PRC's State Council charged with emergency management and emergency rescue.

20.     Defendant Ministry of Civil Affairs of the People's Republic of China ("Ministry of Civil Affairs") is a ministry of the PRC's State Council charged with social and administrative affairs.

21.     The People's Government of Hubei Province ("Hubei Province") is the provincial government of the geographical Hubei province in the PRC.

22.     The People's Government of the City of Wuhan ("City of Wuhan") is the city government of the capital city of Hubei Province in the PRC.

23.     On information and belief, at all relevant times, the PRC, National Health Commission, Ministry of Emergency Management, Ministry of Civil Affairs, Hubei Province, and City of Wuhan (collectivity, the "Chinese Government Defendants") and the Communist Party acted in concert with one another and acted as agents and/or principals of one another in relation to the conduct described herein.

24.     The Wuhan Institute of Virology ("Wuhan Institute") is located in Wuhan and is a research institute that studies virology and related topics.

25.     Since at least November 2019, the Wuhan Institute has conducted research on coronaviruses.

26.     Cables from the United States Department of State have warned of safety concerns at the Wuhan Institute.[1]

27.     The United States is currently conducting "a full-scale investigation into whether the novel coronavirus, which went on to morph into a global pandemic that has brought the global economy to its knees, escaped from" the Wuhan Institute.[2]

---

[1] Josh Rogin, *State Department Cables Warned of Safety Issues at Wuhan Lab Studying Bat Coronaviruses*, Washington Post, (Apr. 14, 2020), https://www.washingtonpost.com/opinions/2020/04/14/state-department-cables-warned-safety-issues-wuhan-lab-studying-bat-coronaviruses/.
[2] Bret Baier, *US Officials Confirm Full-scale Investigation of Whether Coronavirus Escaped from Wuhan lab,* Fox News (Apr. 17, 2020), https://www.foxnews.com/politics/us-officials-investigation-coronavirus-wuhan-lab.

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 5 of 45

28.     Defendant Chinese Academy of Sciences ("Chinese Academy of Sciences") is the national academy of the natural sciences for the PRC and describes itself as "the linchpin of China's drive to explore and harness high technology and the natural sciences for the benefit of China."[3]

29.     The Chinese Academy of Sciences seeks to "commercialize" its discoveries and boasts about spinning off hundreds of companies from its activities.[4]

30.     The Chinese Academy of Sciences administers the Wuhan Institute.

31.     On information and belief, at all relevant times, the Wuhan Institute and the Chinese Academy of Sciences (collectively, the "Laboratory Defendants"), along with the Chinese Government Defendants and the CPC, acted in concert with one another and acted as agents and/or principals of one another in relation to the conduct described herein.

## JURISDICTION AND VENUE

32.     Article III, Section 2 of the United States Constitution extends the judicial power of federal courts to "all Cases … between a State, or the Citizens thereof, and foreign States, Citizens or Subjects."

33.     This Court is given jurisdiction of this matter under 28 U.S.C. § 1330, which provides for jurisdiction over foreign states, and 28 U.S.C. § 1332(a), which provides for jurisdiction over citizens of a State and citizens or subjects of a foreign state and a foreign state itself, where the amount in controversy exceeds $75,000.

34.     The amount in controversy in this matter exceeds $75,000.

---

[3] Chinese Academy of Science, http://english.cas.cn/about_us/introduction/201501/t20150114135284.shtml.
[4] *Id.*

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 6 of 45

35. This Court has jurisdiction over cases filed against foreign states such as the Chinese Government Defendants under the commercial activity exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(2), which provides:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case— … (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

36. A commercial activity is defined to be "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d).

37. On information and belief, the conduct of Defendants described below arises out of commercial activities that have caused a direct effect in the United States and in the State of North Carolina, including, but not limited to: (1) operation of the healthcare system in Wuhan and throughout China; (2) commercial research on viruses by the Wuhan Institute and Chinese Academy of Sciences; (3) the operation of traditional and social media platforms for commercial gain; and (4) production, purchasing, and import and export of medical equipment, such as personal protective equipment ("PPE"), used in COVID-19 efforts.

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 7 of 45

38.     Additionally and in the alternative, this Court has jurisdiction over cases filed

against foreign states such as the Chinese Government Defendants under the non-

commercial tort exception to the FSIA, 28 U.S.C. § 1605(a)(5), which provides:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the
> United States or of the States in any case— … (5) not otherwise encompassed
> by [the commercial activities exception], in which money damages are
> sought against a foreign state for personal injury or death, or damage to or
> loss of property, occurring in the United States and caused by the tortious act
> or omission of that foreign state or of any official or employee of that foreign
> state while acting within the scope of his office or employment; except this
> paragraph shall not apply to— (A) any claim based upon the exercise or
> performance or the failure to exercise or perform a discretionary function
> regardless of whether the discretion be abused, or (B) any claim arising out
> of malicious prosecution, abuse of process, libel, slander, misrepresentation,
> deceit, or interference with contract rights.

39.     The non-commercial tort exception of 28 U.S.C. § 1605(a) (5) applies here

because money damages are sought against "a foreign state for personal injury or death, or

damage to or loss of property, occurring in the United States."

40.     Specifically, for purposes of the non-commercial tort exception of 28 U.S.C.

§ 1605(a) (5), each of the counts enumerated below are torts occurring in the United States.

41.     In addition, the Communist Party is not a foreign state or an agency or

instrumentality of a foreign state, and is not entitled to any form of sovereign immunity.

42.     This Court has personal jurisdiction over the Defendants because the torts,

harms, and injuries occurred in this District and in this Division of this District, and they

otherwise have sufficient contacts in North Carolina and the rest of the United States to

render the exercise of jurisdiction by this Court permissible.

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 8 of 45

43.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) (2) and (c) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District and in this Division of this District.

## GENERAL ALLEGATIONS
## THE ORIGINS OF COVID-19

44.     COVID-19 is an infectious disease that is caused by a novel coronavirus, severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2).

45.     Humans are believed to have first contracted COVID-19 in late 2019, although the precise date is unknown.

46.     Some sources date the first known case in China to November 17, 2019, or possibly earlier.[5]

47.     A variety of sources also date the first known case to December 2019.

48.     One theory on the origin of the virus is that it made a zoonotic transmission from animals at a wet market in Wuhan (the "Wuhan Seafood Market").[6]

49.     Another emerging theory on the origin of the virus is that it was released from the Wuhan Institute of Virology, which was studying the virus as part of a commercial activity.[7]

50.     After first transmission, the virus began to spread rapidly.

---

[5] Josephine Ma, *Coronavirus: China's First Confirmed Covid-19 Case Traced Back to November 17*," South China Morning Press (March 13, 2020), https://www.scmp.com/news/china/society/article/3074991/coronavirus-chinas-first-confirmed-covid-19-case-traced-back.

[6] Chaolin Huang, *Clinical Features of Patients Infected with 2019 Novel Coronavirus in Wuhan, China*, The Lancet (January 24, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30183- 5/fulltext.

[7] Bret Baier, *Sources Believe Coronavirus Outbreak Originated in Wuhan lab as Part of China's efforts to Compete with US,* Fox News (Apr. 15, 2020), https://www.foxnews.com/politics/coronavirus-wuhan-lab-china-compete-us-sources.

51.     According to The Lancet, one of the earliest known patients, a man affiliated with the Wuhan Seafood Market, had a symptom onset date of December 1, 2019.[8]

52.     Just five days later, the wife of this patient, who had no affiliation with the market, began exhibiting symptoms, indicating human-to-human transmission.[9]

53.     According to a study in the Chinese Medical Journal, sometime between December 18 and 29, 2019, laboratory testing was being done on patients who exhibited symptoms consistent with COVID-19.[10]

54.     The study in the Chinese Medical Journal attributed the illnesses to "[a] novel bat-borne [coronavirus] … that is associated with severe and fatal respiratory disease in humans."[11]

55.     According to a study in the New England Journal of Medicine, "[t]he majority of the earliest cases included reported exposure to the Huanan Seafood Wholesale Market, but there was an exponential increase in the number of nonlinked cases beginning in late December."[12]

56.     Thus, on or around late December 2019, healthcare professionals in Wuhan were reporting infections indicating human-to-human transmission.

---

[8] Chaolin Huang, *Clinical Features of Patients Infected with 2019 Novel Coronavirus in Wuhan, China*, The Lancet (January 24, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30183- 5/fulltext.
[9] *Id.*
[10] Li-Li Ren, *Identification of a Novel Coronavirus Causing Severe Pneumonia in Human: a Descriptive Study*, Chinese Medical Journal, (February 21, 2010),
https://journals.lww.com/cmj/Abstract/publishahead/Identification_of_a_novel_coronavirus_causing.99423.aspx.
[11] *Id.*
[12] Li Qun, *Early Transmission Dynamics in Wuhan, China, of Novel Coronavirus– Infected Pneumonia*, New England Journal of Medicine, (Jan. 29, 2020), https://www.nejm.org/doi/10.1056/NEJMoa2001316.

57.     According to Chinese sources cited in the National Review, on December 25, 2019, "Chinese medical staff in two hospitals in Wuhan [were] suspected of contracting viral pneumonia and [were] quarantined. This is additional strong evidence of human-to-human transmission."[13] This was corroborated by the Wall Street Journal.[14]

58.     According to the South China Morning Press, "On December 27, Zhang Jixian, a doctor from Hubei Provincial Hospital of Integrated Chinese and Western Medicine, told China's health authorities that the disease was caused by a new coronavirus. By that date, more than 180 people had been infected, though doctors might not have been aware of all of them at the time."[15]

59.     According to CNN, on December 30, 2019, Dr. Li Wenliang, using the popular chat application WeChat, told his medical school alumni group about patients at his hospital suffering from a SARS-like illness that may have originated from a coronavirus.[16]

60.     In his messages, Dr. Li Wenliang shared details of what would be named COVID-19, urging them to take precautions against the risk of human- to-human transmission.[17]

---

[13] Jim Geraghty, *Devastating Lies*, National Review, (March 23, 2020), https://www.nationalreview.com/the-morning-jolt/chinas-devastating-lies/.
[14] Jeremy Page, *How It All Started: China's Early Coronavirus Missteps*, The Wall Street Journal, (Mar. 6, 2020), https://www.wsj.com/articles/how-it-all-started-chinas-early-coronavirus-missteps-11583508932.
[15] Josephine Ma, *Coronavirus: China's First Confirmed Covid-19 Case Traced Back to November 17*," South China Morning Press (March 13, 2020), https://www.scmp.com/news/china/society/article/3074991/coronavirus-chinas-first-confirmed-covid-19-case-traced-back.
[16] Yong Xiong, *This Chinese Doctor Tried to Save Lives, but was Silenced. Now He Has Coronavirus*, CNN, (Feb. 4, 2020), https://www.cnn.com/2020/02/03/asia/coronavirus-doctor-whistle-blower-intl-hnk/index.html.
[17] *Id.*

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 11 of 45

61.     A study of patients admitted through January 2 found that only 27 of 41 patients had a link to the Wuhan Seafood Market, indicating human-to- human transmission in December.[18]

62.     Despite the previously-mentioned evidence to the contrary, on December 31, 2020, the Wuhan Municipal Health Commission declared, "[t]he investigation so far has not found obvious human-to-human transmission and no medical staff infection."[19]

63.     The World Health Organization ("WHO") was finally informed of these events on December 31, with the organization saying that "the WHO China Country Office was informed of cases of pneumonia unknown etiology (unknown cause) detected in Wuhan City, Hubei Province of China."[20]

64.     On information and belief, part of the Defendants' cover-up involved misleading the WHO, an international organization under the United Nations whose objective is "the attainment by all peoples of the highest possible level of health," according to its Constitution.[21]

65.     On information and belief, the Chinese Government Defendants delayed reporting COVID-19 to the WHO for weeks after the outbreak was identified in the Chinese medical community.

---

[18] Chaolin Huang, *Clinical Features of Patients Infected with 2019 Novel Coronavirus in Wuhan, China*, The Lancet (January 24, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30183- 5/fulltext.
[19] Jim Geraghty, *Devastating Lies*, National Review, (March 23, 2020), https://www.nationalreview.com/the-morning-jolt/chinas-devastating-lies/.
[20] World Health Organization, "Novel Coronavirus SITUATION REPORT, (January 21, 2020), https://www.who.int/docs/default-source/coronaviruse/situation- reports/20200121-sitrep-1-2019-ncov.pdf.
[21] World Health, Organization Constitution, Article I, available at: https://apps.who.int/gb/bd/PDF/bd47/EN/constitution-en.pdf?ua=1.

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 12 of 45

66.     Under Article 6.1 of the International Health Regulations, China had a duty to report "all events which may constitute a public health emergency of international concern within its territory" within 24 hours.

67.     When China did inform the WHO of the disease, Chinese authorities denied human-to-human transmission, despite having significant evidence to the contrary. On information and belief, Defendants' denial induced the WHO to also deny or downplay the risk of human-to-human transmission in the critical weeks while the virus was first spreading.

## DEFENDANTS ALLOW THE VIRUS TO SPREAD

68.     According to data gathered by the New York Times, approximately 175,000 individuals left Wuhan on January 1 alone to travel for the Lunar New Year.[22]

69.     As stated by the New York Times, because of the Lunar New Year travel, "[t]he timing of the outbreak could not have been worse."[23]

70.     According to the Wall Street Journal, China "went ahead with New Year celebrations despite the risk of wider infections" and let "some five million people leave Wuhan without screening."[24]

71.     Many of these travelers went not only to other parts of China, but they also spread out across the globe.

---

[22] Jin Wu, *How the Virus Got Out*, The New York Times, (Mar. 22, 2020), https://www.nytimes.com/interactive/2020/03/22/world/coronavirus spread.html?action=click&module=Spotlight&pgtype=Homepage.
[23] *Id.*
[24] Jeremy Page, *How It All Started: China's Early Coronavirus Missteps*, The Wall Street Journal, (Mar. 6, 2020), https://www.wsj.com/articles/how-it-all-started-chinas-early-coronavirus-missteps-11583508932.

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 13 of 45

72.     In mid-January, on or around January 16, despite knowing the risks of doing so, Wuhan leaders hosted a potluck dinner for 40,000 residents, increasing the potential spread of the virus.[25]

73.     Defendants allowed these massive public gatherings and massive exodus from Wuhan despite knowing the risks of COVID-19, including the risk of human-to-human transmission.

**THE COVERUP BY DEFENDANTS**

74.     On December 30, 2019, the Wuhan Municipal Health Commission released a notice to medical institutions that patients visiting the Wuhan Seafood Market had contracted a pneumonia-like illness. [26]

75.     The notice warned medical professionals, "Any organizations or individuals are not allowed to release treatment information to the public without authorization."[27]

76.     Within hours of sending his warning to colleagues via WeChat on December 30, screenshots of Dr. Li Wenliang's message had been shared widely on social media, but government censors then took action to stop the circulation.[28]

---

[25] James Griffiths, *Is Wuhan's mayor being set up to be the fall guy for the virus outbreak?*, CNN, (Jan. 29, 2020), available at https://www.cnn.com/asia/live-news/coronavirus-outbreak-01-29-20-intl hnk/h_6d8cf9d5c0b2cf01447dd24325ed6dd3.

[26] Yong Xiong, *This Chinese Doctor Tried to Save Lives, but was Silenced. Now He Has Coronavirus*, CNN, (Feb. 4, 2020), https://www.cnn.com/2020/02/03/asia/coronavirus-doctor-whistle-blower-intl-hnk/index.html.

[27] *Id*.

[28] Jeremy Page, *How It All Started: China's Early Coronavirus Missteps*, The Wall Street Journal, (Mar. 6, 2020), https://www.wsj.com/articles/how-it-all-started-chinas-early-coronavirus-missteps-11583508932.

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 14 of 45

77.     On or about December 31, researchers at the University of Toronto began to notice censoring of key words about the virus on Chinese social media platforms. [29]

78.     One of the censored platforms was WeChat, and as explained by the researchers, WeChat "has become increasingly popular among [Chinese] doctors who use it to obtain professional knowledge from peers. Because of social media's integral role in Chinese society and its uptake by the Chinese medical community, systematic blocking of general communication on social media related to disease information and prevention risks substantially harming the ability of the public to share information that may be essential to their health and safety."[30]

79.     On January 1 or 2, the Wuhan police stated that they had "taken legal measures" against eight people who "published and shared rumors online," and one of them is believed to be Dr. Wenliang.[31]

80.     According to CNN, "The police announcement [against the eight people] was broadcast across the country on CCTV, China's state broadcaster, making it clear how the Chinese government would treat such 'rumormongers.'"[32]

---

[29] Lotus Ruan, *How Information on the Coronavirus is Managed on Chinese Social Media," Censored Contagion: How Information on the Coronavirus is Managed on Chinese Social Media*, (Mar. 3, 2020), https://citizenlab.ca/2020/03/censored-contagion-how-information-on-the-coronavirus-is-managed-on-chinese-social-media/.
[30] *Id.*
[31] Yong Xiong, *This Chinese Doctor Tried to Save Lives, but was Silenced. Now He Has Coronavirus*, CNN, (Feb. 4, 2020), https://www.cnn.com/2020/02/03/asia/coronavirus-doctor-whistle-blower-intl-hnk/index.html.
[32] *Id.*

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 15 of 45

81.     The message reportedly said, "The internet is not a land beyond the law ... Any unlawful acts of fabricating, spreading rumors and disturbing the social order will be punished by police according to the law, with zero tolerance."[33]

82.     As described by the St. Louis Post-Dispatch, "The punishment of eight doctors for 'rumor-mongering,' broadcast on national television on Jan. 2, sent a chill through the city's hospitals," and suppressed information from reaching the rest of the world.[34]

83.     On January 1, 2020, "after several batches of genome sequence results had been returned to hospitals and submitted to health authorities, an employee of one genomics company received a phone call from an official at the Hubei Provincial Health Commission, ordering the company to stop testing samples from Wuhan related to the new disease and destroy all existing samples."[35]

84.     Also on January 1, 2020, Dr. Ai Fen, who ran an emergency department at a Wuhan hospital, ordered her staff to put on masks, suspecting human-to-human transmission.[36]

85.     But that night, "the hospital's discipline department summoned her for a chat the next day. She was criticized for 'spreading rumors,' according to Dr. Ai. She tried to

[33] Id.
[34] Amanda St. Amand, Six days of silence when China didn't warn public of likely pandemic, The St. Louis Post Dispatch, (Apr. 16, 2020), https://www.stltoday.com/news/national/your-daily-6-nurses-suspended-over-masks-cheaper-iphone-and-how-six-days-of-silence/collection_a2b87190-132f-5438-a36d-1c48c64be013.html#1.
[35] "How early signs of the coronavirus were spotted, spread and throttled in China," The Strait Times (Feb. 28, 2020), available at: https://www.straitstimes.com/asia/east-asia/how-early-signs-of-the-coronavirus-were-spotted-spread-and-throttled-in-china.
[36] Jeremy Page, How It All Started: China's Early Coronavirus Missteps, The Wall Street Journal, (Mar. 6, 2020), https://www.wsj.com/articles/how-it-all-started-chinas-early-coronavirus-missteps-11583508932.

argue that the disease could be contagious. They said her action caused panic and 'damaged the stability' of Wuhan. The hospital's leadership also banned staff from discussing the disease in public or via texts or images."[37]

86.     On January 2, 2020, the Wuhan Institute completed its genome sequencing of the virus. [38]

87.     Discovery of the genome sequence was not announced at the time.[39]

88.     On January 3, 2020, Dr. Wenliang was forced to confess to a misdemeanor, prepare a self-criticism, and agree not to commit any additional "unlawful acts."[40]

89.     On January 3, 2020, "China's National Health Commission (NHC), the nation's top health authority, ordered institutions not to publish any information related to the unknown disease, and ordered labs to transfer any samples they had to designated testing institutions, or to destroy them."[41]

90.     The National Review, quoting Chinese sources, stated that on January 3, the "Wuhan Municipal Health Commission released another statement, repeating, 'As of now, preliminary investigations have shown no clear evidence of human-to-human transmissions and no medical staff infections.'"[42]

---

[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] Yong Xiong, *This Chinese Doctor Tried to Save Lives, but was Silenced. Now He Has Coronavirus,* CNN, (Feb. 4, 2020), https://www.cnn.com/2020/02/03/asia/coronavirus-doctor-whistle-blower-intl-hnk/index.html.
[41] Yu Gao, *How Early Signs of the Coronavirus were Spotted, Spread and Throttled in China,*" The Strait Times, (Feb. 28, 2020), https://www.straitstimes.com/asia/east-asia/how-early-signs-of-the-coronavirus-were-spotted-spread-and-throttled-in-china.
[42] Jim Geraghty, *Devastating Lies,* National Review, (March 23, 2020), https://www.nationalreview.com/the-morning-jolt/chinas-devastating-lies/.

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 17 of 45

91.     According to the Wall Street Journal, on January 5, "a medical research center in Shanghai notified the National Health Commission that one of its professors had also identified a SARS-like coronavirus and mapped the entire genome using a sample from Wuhan."[43]

92.     Like the genome discovery by the Wuhan Institute on January 2, the January 5 genome mapping was not made public for several days.[44]

93.     On January 5, 2020, relying on information from Chinese officials, WHO released a statement saying, "Based on the preliminary information from the Chinese investigation team, no evidence of significant human-to- human transmission and no health care worker infections have been reported."[45]

94.     On January 6, the United States Centers for Disease Control offered to send a research team to assist Defendants, but Defendants did not extend permission to enter the country.[46]

95.     On January 8, 2020, WHO, relying on information from Chinese officials, said, "WHO does not recommend any specific measures for travelers. WHO advises

[43] Jeremy Page, *How It All Started: China's Early Coronavirus Missteps*, The Wall Street Journal, (Mar. 6, 2020), https://www.wsj.com/articles/how-it-all-started-chinas-early-coronavirus-missteps-11583508932.
[44] *Id.*
[45] World Health Organization, *Pneumonia of unknown cause – China*, (Jan. 5, 2020), https://www.who.int/csr/don/05-january-2020-pneumonia-of-unkown-cause-china/en/.
[46] Marisa Taylor, *Exclusive: U.S. axed CDC Expert Job in China Months Before Virus Outbreak*," Reuters, (Mar. 22, 2020), https://www.reuters.com/article/us-health-coronavirus-china-cdc- exclusiv/exclusive-u-s-axed-cdc-expert-job-in-china-months-before-virus- outbreak-idUSKBN21910S.

against the application of any travel or trade restrictions on China based on the information currently available."[47]

96.    Chinese authorities, including Defendants, did not publicly confirm the outbreak as originating from a novel coronavirus until January 9, 2020, despite having a mapping of its genome and other details showing that it was a new virus.[48]

97.    On January 10, the New York Times attributed to the Wuhan City Health Commission a statement that "[t]here is no evidence that the virus can be spread between humans."[49]

98.    According to the National Review, citing Chinese sources, on January 11, the Wuhan City Health Commission issued a statement saying, "All 739 close contacts, including 419 medical staff, have undergone medical observation and no related cases have been found . . . No new cases have been detected since January 3, 2020. At present, no medical staff infections have been found, and no clear evidence of human-to-human transmission has been found."[50] This statement directly contradicted then-existing evidence.

---

[47] World Health Organization, *Statement Regarding Cluster of Pneumonia Cases in Wuhan, China*," WHO, (Jan. 9, 2020), https://www.who.int/china/news/detail/09-01-2020-who-statement-regarding-cluster-of-pneumonia-cases-in-wuhan-china.
[48] Jeremy Page, *How It All Started: China's Early Coronavirus Missteps*, The Wall Street Journal, (Mar. 6, 2020), https://www.wsj.com/articles/how-it-all-started-chinas-early-coronavirus-missteps-11583508932.
[49] Amy Qin, *China Reports First Death From New Virus*, The New York Times, (Jan. 10, 2010), https://www.nytimes.com/2020/01/10/world/asia/china-virus-wuhan-death.html.
[50] Compare, Jim Geraghty, Devastating Lies, National Review, (March 23, 2020), https://www.nationalreview.com/the-morning-jolt/chinas-devastating-lies/. and Jeremy Page, How It All Started: China's Early Coronavirus Missteps, The Wall Street Journal, (Mar. 6, 2020), https://www.wsj.com/articles/how-it-all-started-chinas-early-coronavirus-missteps-11583508932.

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 19 of 45

99.     Chinese authorities, including Defendants, did not share the genome sequence, which the Wall Street Journal described as a "critical step toward containing the epidemic and designing a vaccine" with the international community until January 12.[51]

100.     The first case outside of China was reported in Thailand on January 13.[52]

101.     Following the Thai case, Defendants did not tell the public about the new evidence directly confirming human-to-human transmission.[53]

102.     For instance, PRC and CPC officials continued denying human-to- human transmission and failed to inform the public, despite overwhelming evidence of the virus's contagiousness.[54]

103.     According to the National Review, citing Chinese sources, on January 14, the Wuhan City Health Commission issued another statement saying, "Among the close contacts, no related cases were found."[55]

104.     According to the Wall Street Journal, when President and General Secretary Xi Jinping, leader of the PRC and CPC, made "his first public statement on the crisis on January 20, he made no explicit mention of human- to-human transmission."[56]

---

[51] *Id.*

[52] Amanda St. Amand, *Six days of silence when China didn't warn public of likely pandemic*, The St. Louis Post Dispatch, (Apr. 16, 2020), https://www.stltoday.com/news/national/your-daily-6-nurses-suspended-over-masks-cheaper-iphone-and-how-six-days-of-silence/collection_a2b87190-132f- 5438-a36d-1c48c64be013.html#1.

[53] *Id.*

[54] *Id.*

[55] Jim Geraghty, *Devastating Lies*, National Review, (March 23, 2020), https://www.nationalreview.com/the-morning-jolt/chinas-devastating-lies/.

[56] Jeremy Page, *How It All Started: China's Early Coronavirus Missteps*, The Wall Street Journal, (Mar. 6, 2020), https://www.wsj.com/articles/how-it-all-started-chinas-early-coronavirus-missteps-11583508932.

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 20 of 45

105. By the time President Xi made his statement, millions of travelers passed through Wuhan, and "more than 3,000 people had been infected during almost a week of public silence, according to internal documents obtained by The Associated Press and expert estimates based on retrospective infection data."[57]

106. The Wuhan City Health Commission continued publicly to deny human-to-human transmission until January 20,[58] at which point a Chinese authorities finally confirmed for the first time that human-to-human transmission was occurring.[59]

107. On January 20 and 21, 2020, the WHO was able to conduct a mission on the ground in China and said afterward, "Data collected through detailed epidemiological investigation and through the deployment of the new test kit nationally suggests that human-to-human transmission is taking place in Wuhan. More analysis of the epidemiological data is needed to understand the full extent of human-to-human transmission."[60]

108. On January 23, 2020, China began its first steps towards quarantining Wuhan residents.

109. Weeks after the lockdown slowed cases in Wuhan, China continued to mislead the world about its knowledge of the nature of the virus, and on April 17, 2020, it

---

[57] Amanda St. Amand, *Six days of silence when China didn't warn public of likely pandemic*, The St. Louis Post Dispatch, (Apr. 16, 2020), https://www.stltoday.com/news/national/your-daily-6-nurses-suspended-over-masks-cheaper-iphone-and-how-six-days-of-silence/collection_a2b87190-132f-5438-a36d-1c48c64be013.html#1.
[58] *Id.*
[59] Lily Kuo, *China Confirms Human-to-human Transmission of Coronavirus*, The Guardian, (January 20, 2020), https://www.theguardian.com/world/2020/jan/20/coronavirus-spreads-to-beijing-as-china-confirms-new-cases.
[60] World Health Organization, *Mission summary: WHO Field Visit to Wuhan, China 20-21 January 2020*, WHO, (Jan. 22, 2020), https://www.who.int/china/news/detail/22-01-2020-field-visit-wuhan-china-jan-2020.

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 21 of 45

upwardly revised the death toll in Wuhan by more than a thousand cases, attributing the error to "incorrect reporting, delays and omissions."[61]

110.    Chinese citizen journalists, who posted videos from Wuhan of overcrowded hospitals and other scenes from the COVID-19 pandemic, have gone missing in recent weeks.[62]

111.    On information and belief, China continues to mislead the world about the infection rate, fatality rate, and other key statistics of COVID-19.

112.    China has launched a "massive public relations campaign to avoid blame for the COVID-19 pandemic" and has spread conspiracy theories that the U.S. military had spread the virus.[63]

## THE EFFECTS OF DEFENDANTS' ACTIONS

113.    Due to Defendants' malfeasance, COVID-19 spread rapidly across the world, and as of April 20, 2020, the New York Times reports 770,138 confirmed cases in the United States and 37,186 deaths.[64]

114.    As of April 29, 2020, North Carolina has more than 10,000 confirmed infections from COVID-19, and at least 379 North Carolinians have died.[65]

---

[61] Scott Neuman, *China Raises Wuhan Death Stats By Half To Account For Reporting Delays and Omissions,* National Public Radio, (Apr. 17, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/17/836700806/china-raises-wuhan-death-stats-by-half-to-account-for-reporting-delays-and-omiss.
[62] Frank Miles, *2 Wuhan whistleblowers missing months after helping expose coronavirus outbreak, activists say*, Fox News, (Apr. 15, 2020), https://www.foxnews.com/world/wuhan-whistleblowers-missing-exposing-coronavirus.
[63] "Guest on Chinese-produced Arabic-language program claimed US may be to blame for coronavirus pandemic," Fox News (Apr. 19, 2020), https://www.foxnews.com/world/chinese-arabic-language-program-us- coronavirus-pandemic.
[64] The New York Times, *Coronavirus in the U.S.: Latest Map and Case Count*, The New York Times, (Apr. 20, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.
[65] *Simone Jasper, Coronavirus Live Updates, Here's What To Know In North Carolina,* The News and Observer, (Apr. 29, 2020), https://www.newsobserver.com/news/coronavirus/article242357726.html.

115.     In addition to the toll on human life and health, the pandemic has caused enormous economic disruptions across the United States and in North Carolina, with tens of millions of Americans and many thousands of North Carolinians filing jobless claims.[66]

116.     Before the pandemic, North Carolina had one of its lowest unemployment rates of the past decade, but on information and belief, North Carolina's unemployment rate is now the highest it has been since the Great Depression.

117.     The pandemic unleashed by Defendants has had enormous economic impacts on virtually every citizen of North Carolina.

118.     Responding to the pandemic has required shutting down businesses, disrupting ordinary production and trade, and dislocating workers.

119.     Innumerable citizens of North Carolina have suffered economic losses as a result of the pandemic. These include loss of jobs, loss of income, loss of business opportunities, and other economic losses.

120.     Beyond the costs in terms of health, life, and the economy, the toll to human relationships has been enormous, as people are unable to visit family and friends, celebrate major life milestones like high school or college graduations, or even attend Easter or Passover religious services. Literally every resident of North Carolina has suffered an economic, emotional, and/or spiritual toll of the coronavirus.

---

[66] Maximiliano Dvorkin, *The Impact of COVID-19 on Labor Markets across the U.S.,* The Federal Reserve Bank of St. Louis, (Apr. 13, 2020), https://www.stlouisfed.org/on-the-economy/2020/april/impact-covid-19-labor-markets-us.

121.    Doctors and other medical professionals on the front line are also being separated from their families.

122.    In addition to emotional turmoil and economic disruption, Defendants' course of conduct has inflicted enormous educational disruption on North Carolina students at every level, from preschool through graduate studies. Schools have been closed for months, graduations and tests canceled, students isolated at home, libraries closed, and learning completely disrupted.

## DEFENDANTS' ACTIONS AS TO PPE

123.    On March 13, 2020, the New York Times ran a story documenting China's hoarding of PPE, saying China has "claimed mask factory output for itself."[67]

124.    According to the New York Times report, "Peter Navarro, an adviser to President Trump on manufacturing and trade, contended on Fox Business last month that China had essentially taken over factories that make masks on behalf of American companies. Beijing, he said, had opted to 'nationalize effectively 3M, our company.'"[68]

125.    According to the New York Times, "China did not just stop selling masks— it also bought up much of the rest of the world's supply."[69]

---

[67] Keith Bradsher, *The World Needs Masks. China Makes Them, but Has Been Hoarding Them,* The New York Times, (Mar. 13, 2020), https://www.nytimes.com/2020/03/13/business/masks-china-coronavirus.html.
[68] *Id.*
[69] *Id.*

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 24 of 45

126.    Defendants' hoarding efforts resulted in it going "from being a net exporter of personal protective equipment, as it is the largest producer in the world, to a net importer."[70]

127.    According to a recent piece in the Washington Post, White House officials believe China's actions of hoarding and importing PPE were a "deliberate attempt by China to corner the market as it concealed and downplayed the danger posed by the outbreak."[71]

128.    China is not currently allowing U.S. companies to bring PPE or coronavirus test kits back to the United States, citing quality concerns.[72]

129.    The little PPE that China has released has drawn complaints from governments and hospitals across the world for being faulty, raising the prospect that it is keeping quality materials for itself while shipping defective equipment elsewhere.[73]

130.    On information and belief, the Defendants' hoarding of PPE has been motivated, at least in part, by the desire to profit from increased worldwide demand of PPE during the viral outbreak, including in North Carolina.

---

[70] Jeff Poor, *Navarro: China Went from a Net Exporter of PPE to a Large Net Importer*, Fox News, (Apr. 19, 2020), https://www.breitbart.com/clips/2020/04/19/navarro-china-went-from-a-net-exporter-of-ppe-to-a-large-net-importer/.

[71] Juliet Eilperin, *U.S. Sent Millions of Face Masks to China Early this Year, Ignoring Pandemic Warning Signs*, The Washington Post, (Apr. 18, 2020), https://www.washingtonpost.com/health/us-sent-millions-of-face-masks-to-china-early-this-year-ignoring-pandemic-warning-signs/2020/04/18/aaccf54a-7ff5-11ea-8013-1b6da0e4a2b7_story.html.

[72] Kate O'Keeffe, *China's Export Restrictions Strand Medical Goods U.S. Needs to Fight Coronavirus, State Department Says,* The Wall Street Journal, (Apr. 16, 2020), https://www.wsj.com/articles/chinas-export-restrictions-strand-medical-goods-u-s-needs-to-fight-coronavirus-state-department-says-11587031203?mod=hp_lead_pos2.

[73] David Brunnstrom, *U.S. Asks China to Revise Export Rules for Coronavirus Medical Gear*, Reuters, (Apr. 16, 2020), https://www.reuters.com/article/us-heath-coronavirus-usa-china/u-s-asks-china-to-revise-export-rules-for-coronavirus-medical-gear-idUSKBN21Z07G.

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 25 of 45

131.    On information and belief, Defendants' hoarding of PPE has adversely impaired the ability of health care providers throughout the world, including in the United States and in North Carolina, from safely and effectively treating patients with the virus.

### FIRST CLAIM FOR RELIEF
(Public Nuisance)
(Against All Defendants)

132.    Plaintiffs repeat, restate, and incorporate by reference all allegations in Paragraphs 1 to 130.

133.    Under North Carolina law, a defendant is liable for the tort of public nuisance when its conduct unreasonably interferes with a right common of the general public, such as interference with the public health and public safety.

134.    As one court has explained, "To constitute a public nuisance, the condition of things must be such as injuriously affects the community at large.... Whatever tends to endanger life, or generate disease, and affect the health of the community ... is generally, at common law, a public nuisance, and a crime." *State ex. rel. Howes v. W.R. Peele Trust*, 876 F.Supp. 733 (E.D.N.C. 1995).

135.    Each Defendant owed a duty to the public, including North Carolina's residents, not to offend, interfere with, or damage the common rights of North Carolinians through fraudulent, reckless, and negligent actions and omissions.

136.    Defendants, in violation of the International Health Regulations, and in violation of the common good and North Carolinians' life and health, failed to quarantine its population against a virus known to be exceptionally dangerous.

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 26 of 45

137. Defendants, in violation of the common good and North Carolinians' life and health, took steps, including (but not limited to) censoring media, ceasing and censoring research, destroying scientific materials, making false and/or misleading statements to the international community, hoarding PPE for gain, and punishing medical professionals that impeded the ability of the medical community and others to stop the spread of COVID-19 and its consequences.

138. The repeated unlawful and unreasonable acts and omissions of the Defendants, including their commercial activities, as alleged herein, have been injurious to—and have significantly interfered with—the lives, health, and safety of substantial numbers of North Carolina residents, ruining lives and damaging the public order and economy of the State of North Carolina.

139. As a proximate result of Defendants' conduct, the State and its residents have suffered billions and possibly tens of billions of dollars in economic damages, as well as substantial non-economic damages.

140. The conduct of the Defendants was knowing, willful, and in reckless disregard of the rights of the State and its residents. Defendants demonstrated a complete indifference to or conscious disregard for the safety of the public and their conduct was unreasonable and was reckless in light of the known risks to them of COVID-19.

141. Defendants have engaged in a continuing course of conduct. Defendants' unreasonable bad acts—as well as the resulting harm to the health, well-being, safety,

comfort, economic interests, and rights of North Carolina and its residents—continue unabated.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs, jointly and severally against each and every Defendant, as follows: (a) determine that all Defendants created a public nuisance; (b) order that Defendants pay all restitution authorized by law; (c) order that all Defendants abate the nuisance, reimburse the cost of the State's abatement efforts, and pay compensatory damages for harms caused by the nuisance; (d) issue injunctive relief; (e) order that Defendants pay punitive damages; (f) order that Defendants pay all reasonable costs attributable to the prosecution of this civil action; (g) order that Defendants pay prejudgment interest; and (h) order such further relief as the Court deems just and appropriate.

## SECOND CLAIM FOR RELIEF
(Strict Liability for Unreasonably Dangerous Activities)
(Against All Defendants)

142.    Plaintiffs repeat, restate, and incorporate by reference all allegations in Paragraphs 1 to 140.

143.    North Carolina recognizes strict liability for abnormally dangerous activities through adoption of the Restatement (Second) of Torts § 519, which provides: "One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 28 of 45

144.   "In determining whether an activity is abnormally dangerous, the following factors are to be considered: (a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes." Restatement (Second) of Torts § 520.

145.   On information and belief, the Chinese Government Defendants, the Communist Party, and the Laboratory Defendants engaged in commercial and other research on coronaviruses through the Wuhan Institute.

146.   On information and belief, one likely source for the origin of the virus is through release from the Wuhan Institute, a laboratory with known safety concerns.

147.   Research on contagious viruses is an unusual activity with a high risk of harm, and the harm that can result from that research is great, with an inability to eliminate the risk of harm.

148.   On information and belief, the type of research carried on at the Wuhan Institute was inappropriate to the place where the research was conducted, especially in light of known safety concerns at the lab.

149.   On information and belief, the community value of the activity at the Wuhan Institute was low, but the activity was nonetheless dangerous.

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 29 of 45

150.    On information and belief, Defendants have engaged in a cover-up about the origins of the virus, including its release from the Wuhan Institute.

151.    Defendants, in violation of the common good and North Carolinians' lives and health, took steps including (but not limited to) censoring media, ceasing and censoring research, destroying scientific materials, making false and misleading statements to the international community, hoarding PPE, and punishing medical professionals that impeded the ability of the medical community and others to stop the spread of COVID-19 and its consequences.

152.    The repeated abnormally dangerous activities of the Defendants, as alleged herein, have been injurious to—and have significantly interfered with—the lives, health, and safety of substantial numbers of North Carolina residents, ruining lives and damaging the public order and economy of the State of North Carolina.

153.    As a proximate result of Defendants' conduct, the State and its residents have suffered billions and possibly tens of billions of dollars in economic damages, as well as substantial non-economic damages.

154.    The conduct of the Defendants was knowing, willful, and in reckless disregard of the rights of the State and its residents. Defendants demonstrated a complete indifference to or conscious disregard for the safety of the public and their conduct was unreasonable and was reckless in light of the known risks to them of COVID-19.

155.    Defendants have engaged in a continuing course of conduct.

156.    Defendants' abnormally dangerous activities—as well as the resulting harm to the health, well-being, safety, comfort, economic interests, and rights of North Carolina and its residents—continue unabated.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs, jointly and severally against each and every Defendant, as follows: (a) determine that the Chinese Government Defendants, the Communist Party, and the Laboratory Defendants engaged in abnormally dangerous activities; (b) order that Defendants pay all civil damages and restitution authorized by law; (c) order that all Defendants cease the abnormally dangerous activities, reimburse the cost of the State's abatement efforts, and pay compensatory damages for harms caused by the abnormally dangerous activities; (d) issue injunctive relief; (e) order that Defendants pay punitive damages; (f) order that Defendants pay all reasonable costs attributable to the prosecution of this civil action; (g) order that Defendants pay prejudgment interest; and (h) order such further relief as the Court deems just and appropriate.

### THIRD CLAIM FOR RELIEF
(Allowing Transmission of Covid-19)
(Against All Defendants)

157.    Plaintiffs repeat, restate, and incorporate by reference all allegations in Paragraphs 1 to 155.

158.    Under North Carolina law, a defendant is liable for breach of duty where a plaintiff establishes "(1) legal duty on the part of the defendant to conform to a certain standard of conduct to protect others against unreasonable risks; (2) a breach of that duty;

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 31 of 45

(3) a proximate cause between the conduct and the resulting injury; and (4) actual damages to the claimant's person or property."

159. Under North Carolina law, the doctrine of res ipsa loquitur "simply allows the plaintiff who can show that the injury does not occur in the absence of negligence to present to the jury an inference that the defendants were negligent."

160. The unleashing of COVID-19 on the world has caused countless injuries to public health and economic injuries that would not have occurred in the absence of breach of duty on the part of Defendants.

161. Under North Carolina law, the doctrine of negligence per se applies when the standard of care is defined by legal rules, and therefore, a violation of the legal rule constitutes a breach of the duty of care.

162. The Chinese Government Defendants had a duty to report "all events which may constitute a public health emergency of international concern within its territory" within 24 hours under Article 6.1 of the International Health Regulations, yet it failed to do so.

163. In violation of their duties to the world, Defendants engaged in a cover-up and misleading public relations campaign, censoring scientists, ordering the destruction and suppression of valuable research, and refusing cooperation with the global community, all in violation of international health standards.

164. The repeated breaches of duty by the Defendants, as alleged herein, have been injurious to—and have significantly interfered with—the lives, health, and safety of

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 32 of 45

substantial numbers of North Carolina residents, ruining lives and damaging the public order and economy of the State of North Carolina.

165. As a proximate result of Defendants' conduct, the State and its residents have suffered billions and possibly tens of billions of dollars in economic damages, as well as substantial non-economic damages.

166. The conduct of the Defendants was knowing, willful, and in reckless disregard of the rights of the State and its residents. Defendants demonstrated a complete indifference to or conscious disregard for the safety of the public and their conduct was unreasonable and was reckless in light of the known risks to them of COVID-19.

167. Defendants have engaged in a continuing course of conduct. Defendants' breach of duty and negligence—as well as the resulting harm to the health, well-being, safety, comfort, economic interests, and rights of North Carolina and its residents—continue unabated.

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in favor of Plaintiffs, jointly and severally against each and every Defendant, as follows: (a) determine that the Defendants were negligent and breached duties owed to North Carolina and North Carolinians; (b) order that Defendants pay all civil damages and restitution authorized by law; (c) order that all Defendants cease their negligence, reimburse the cost of the State's abatement efforts, and pay compensatory damages for harms caused by their negligence; (d) issue injunctive relief; (e) order that Defendants pay punitive damages; (f) order that Defendants pay all reasonable costs attributable to the prosecution of this civil

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 33 of 45

action; (g) order that Defendants pay prejudgment interest; and (h) order such further relief as the Court deems just and appropriate.

## FOURTH CLAIM FOR RELIEF
(Unlawful Hoarding of PPE)
(Against all Defendants)

168.    Plaintiffs repeats, restates, and incorporates by reference all allegations in Paragraphs 1 to 166.

169.    Defendants have restricted exports of PPE and allowed the export of ineffective PPE, all while knowing (and even suppressing) the dangers of COVID-19.

170.    Defendants had a duty not to hoard PPE and not to provide ineffective PPE to medical providers, and doing so has caused injury across the state of North Carolina, allowing further spread of COVID-19.

171.    Defendants' actions with respect to PPE are commercial activities.

172.    The repeated breaches of duty by the Defendants, as alleged herein, have been injurious to and have significantly interfered with the lives, health, and safety of substantial numbers of North Carolina residents, ruining lives and damaging the public order and economy of the State of North Carolina.

173.    As a proximate result of Defendants' conduct, the State and its residents have suffered billions and possibly tens of billions of dollars in economic damages, as well as substantial non-economic damages.

174.    The conduct of the Defendants was knowing, willful, and in reckless disregard of the rights of the State and its residents. Defendants demonstrated a complete

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 34 of 45

indifference to or conscious disregard for the safety of the public and their conduct was unreasonable and was reckless in light of the known risks to them of COVID-19.

175. Defendants have engaged in a continuing course of conduct. Defendants' breach of duty and negligence—as well as the resulting harm to the health, well-being, safety, comfort, economic interests, and rights of North Carolina and its residents— continue unabated.

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in favor of Plaintiffs, jointly and severally against each and every Defendant, as follows: (a) determine that the Defendants were negligent and breached duties owed to North Carolina and North Carolinians; (b) order that Defendants pay all civil damages and restitution authorized by law; (c) order that all Defendants cease their negligence, reimburse the cost of the State's abatement efforts, and pay compensatory damages for harms caused by their negligence; (d) issue injunctive relief; (e) order that Defendants pay punitive damages; (f) order that Defendants pay all reasonable costs attributable to the prosecution of this civil action; (g) order that Defendants pay prejudgment interest; and (h) order such further relief as the Court deems just and appropriate.

## FIFTH CLAIM FOR RELIEF
(Negligent Infliction of Emotional Distress)
(Against all Defendants)

176. Named Plaintiffs who are natural persons adopt, incorporate by reference, and restate the foregoing allegations in paragraphs 1 through 174, as if fully set forth herein, and further allege.

177. Due to the negligence described herein, Named Plaintiffs and the members of the classes have suffered discernable physical manifestations and injuries of trauma from the negligent conduct, including, but not limited, to physical pains, headaches, anxiety, and insomnia.

178. These physical injuries and manifestations have been directly caused by the by the psychological trauma suffered due to Defendant's egregious conduct and its effect on themselves and their loved ones.

179. Named Plaintiffs and the members of the classes have been in close proximity to the negligent conduct causing their injuries.

180. Named Plaintiffs and the members of the classes have a close personal relationship to the directly injured persons if it is not themselves who have been directly injured.

181. As a direct and proximate result of Defendants' conduct as described herein, Named Plaintiffs and the members of the classes have been injured and harmed, and have suffered damages and economic harms, and seek actual, special, and compensatory damages.

### SIXTH CLAIM FOR RELIEF
(Intentional Infliction of Emotional Distress)
(Against all Defendants)

182. Named Plaintiffs who are natural persons adopt, incorporate by reference, and restate the foregoing allegations in paragraphs 1 through 180, as if fully set forth herein, and further allege:

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 36 of 45

183. Alternatively to the negligence described herein, Defendants acted intentionally and/or recklessly out of their own economic self-interest, and knew or should have known that emotional distress would likely result from their conduct.

184. Defendants' conduct, as described herein, was outrageous, going beyond all bounds of decency, and is utterly intolerable in a civilized world.

185. Defendants' conduct has caused severe emotional distress to the Named Plaintiffs and the members of the classes.

186. As a direct and proximate result of Defendants' intentional and reckless conduct, as described herein, Named Plaintiffs and the members of the classes have been injured and harmed, and have suffered damages and economic harms, and seek actual, special, and compensatory damages.

## SEVENTH CAUSE OF ACTION
(Intentional Torts- Toxic Battery/Civil Assault)
(Against all Defendants)

187. Named Plaintiffs who are natural persons adopt, incorporate by reference, and restate the foregoing allegations in paragraphs 1 through 185, as if fully set forth herein, and further allege:

188. Defendants through their active concealment of the dangers of COVID-19,and failure to contain it, set in motion a virus (and carriers of the virus) that allow/allowed the virus to touch Named Plaintiffs and class members in a harmful and offensive manner, and infecting them.

189. Defendants acted with the substantial certainty that the harm would occur,

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 37 of 45

190. Alternatively, Defendants' conduct, as described herein, put Named Plaintiffs and class members who did not/do not become infected with the virus, in fear of the imminent toxic battery described herein.

191. Defendants' intent for either tort is transferable to the other tort.

192. As a result of Defendants' commission of both the toxic battery and civil assault, Named Plaintiffs and class members have been injured and harmed, and seek nominal, actual and compensatory damages.

## **EIGHTH CLAIM FOR RELIEF**
(Punitive Damages)
(Against All Defendants)

193. Plaintiffs repeats, restates, and incorporates by reference all allegations in Paragraphs 1 to 191.

194. Defendants are liable to Plaintiffs for compensatory damages as aforesaid, and, at all times relevant to the allegations contained herein, Defendants' conduct was aggravated in that the same was fraudulent, malicious, willful, and wanton in the following particulars, without limitation thereto:

    A.    Defendants fraudulently, willfully, intentionally, and maliciously undertook the course of action as detailed herein;

    B.    Defendants fraudulently, willfully, intentionally, and maliciously conspired and confederated with each other to engage in the course of action as detailed herein;

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 38 of 45

C.     Defendants had actual knowledge of the fraudulent and malicious nature of their conduct;

D.     Defendants purposefully and willfully engaged in the aforesaid conduct with actual knowledge of the damage such would do to Plaintiffs.

195.   Under the provisions of G.S. 1D-1, punitive damages may be awarded, in an appropriate case and subject to the provisions of Chapter 1D of the North Carolina General Statutes, in order to punish a defendant for egregiously wrongful acts and to deter the defendant and others from committing similar wrongful acts. Such purposes will be fulfilled by an award of punitive damages against Defendants in this case because there is evidence of the following:

A.     Defendants' motives and conduct were reprehensible;

B.     There was a reasonable likelihood of serious harm;

C.     Defendants had actual knowledge of the probable consequences of their conduct; and

D.     Defendants are reasonably believed to have the ability to pay punitive damages, as will be established by their income and net worth.

196.   Plaintiffs is entitled to an award of punitive damages on the grounds hereinabove set forth in an amount to be determined by the trier of fact in its discretion.

## CLASS ACTION ALLEGTIONS

197.   The Named Plaintiffs with claims against Defendants asserts North Carolina Non-Commercial Tort Classes pursuant to Rules 23(a), (b)(1), (b)(2), (b)(3) and/or 23(c)(4)

of the Federal Rules of Civil Procedure, on behalf of themselves and those similarly situated, against the Defendants for whom they have standing. The Named Plaintiffs defines the North Carolina Non-Commercial Tort Class as follows: All persons and legal entities in the State of North Carolina who have suffered injury, damage, and loss related to the outbreak of the COVID-19 virus.

198.    Excluded from the Class are the following: (1) the Defendants, and any parent, subsidiary or affiliate organizations, and the officers, directors, agents, servants, or employees of same, and the members of the immediate family of any such person; (2) all persons and entities who timely opt out of this proceeding; (3) all persons who have given valid releases releasing Defendants from the claims asserted in this Complaint; (4) all persons who, prior to the filing of this Complaint, have filed a non- class action claim against the Defendants (or any of them) for the claims asserted in this Complaint; and (5) the judge(s) to whom this case is assigned, their employees and clerks, and immediate family members.

199.    The Class is sufficiently numerous such that the joinder of all members of the Classes in a single action is impracticable. The population of the State of North Carolina is over 10.5 million people, and a substantial majority of those persons and related entities have been or will in the immediate future be affected by Defendants' wrongful conduct.

200.    There are numerous common questions of law and fact that predominate over any questions affecting only individual members of the Classes and/or Subclasses. Among these common questions of law and fact are the following:

A. Whether Defendants' conduct was negligent and/or reckless;

B. Whether Defendant's conduct was clearly contrary to the precepts of humanity;

C. Whether Defendants' conduct violated established laws within the PRC; and

D. Whether the PRC's bio-weapons labs are ultra-hazardous activities, and caused the release of the virus;

201. The claims of the Named Plaintiffs are typical of the claims of each member of the Class in that, among other issues:

A. The Named Plaintiffs' claims arise from the same course of conduct of Defendants giving rise to the claims of other Class Members;

B. The claims of the Named Plaintiffs and each member of the Class are based upon the same legal theories;

C. The Named Plaintiffs and each member of the Classes have an interest in prevailing on the same legal claims;

D. The types of damages incurred by the Named Plaintiffs are similar to those incurred by the other Class Members;

E. The defenses asserted by Defendants will be very similar, if not identical, as to the Named Plaintiffs and all Class Members.

202. Named Plaintiffs are adequate representatives of the Classes in which they participate because, together with their legal counsel, they will fairly and adequately

protect the interests of the Class. Named Plaintiffs and all Class Members have a similar, if not identical interest in obtaining the relief sought. Proof of the claims of the Named Plaintiffs will also prove the claims of the Class. Named Plaintiffs are not subject to any unique defenses. Named Plaintiffs have no known conflict with the Class and are committed to the vigorous prosecution of this action.

203. The undersigned counsel is competent counsel, and such counsel will fairly and adequately protect the interests of the Classes

204. The various claims asserted in this action are certifiable under the provisions of Federal Rules of Civil Procedure 23(b)(1) because prosecuting separate actions by or against individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party opposing the Class; or adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of the other Class Members who are not parties to the individual adjudications, or would substantially impair or impede their ability to protect their interests.

205. The claims for injunctive relief in this case are certifiable under Fed. R. Civ. P. 23(b) (2). Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief and/or declaratory relief is appropriate respecting the Class as a whole.

206. Plaintiffs' legal claims are properly certified pursuant to Rule 23(b)(3) in that: (1) a class action is superior in this case to other methods of dispute resolution; (2)

Case 1:20-cv-00433   Document 1   Filed 05/15/20   Page 42 of 45

the Class Members have an interest in class adjudication rather than individual adjudication because of their overlapping rights; (3) it is highly desirable to concentrate the resolution of these claims in this single forum because it would be difficult and highly unlikely that the affected Class Members would protect their rights on their own without this class action case; (4) the disparity between the resources of Defendants and Class Members would make prosecution of individual actions a financial hardship on Class Members; (5) the prosecution of separate actions by individual Class Members, or the individual joinder of all Class Members is impractical and would create a massive and unnecessary burden on the Court's resources; and (6) Management of the class will be efficient and far superior to the management of individual lawsuits. Moreover, currently, the undersigned counsel is unaware of any other pending litigation regarding this controversy with respect to the claims asserted here.

207. The issues particularly common to the Class Members' claims, some of which are identified above, are alternatively certifiable pursuant to Fed. R. Civ. P. 23(c) (4), as resolution of these issues would materially advance the litigation, and class resolution of these issues is superior to repeated litigation of these issues in separate trials.

208. Named Plaintiffs have retained counsel to represent them in this lawsuit, and is obligated to pay said counsel reasonable attorneys' fees provided recovery is obtained.

WHEREFORE, Plaintiffs respectfully requests that the Court certify this as a class action under the Federal Rules of Civil Procedure; and further Plaintiffs respectfully

request that the Court enter judgment in favor of Plaintiffs and the Class, and enter an order jointly and severally against each and every Defendant that:

(a)     Awards Plaintiffs and the Class all restitution authorized by law;

(b)     Enters injunctive relief;

(c)     Awards Plaintiffs and the Class all civil penalties authorized by law;

(d)     Awards Plaintiffs and the Class all actual damages authorized by law;

(e)     Awards Plaintiffs and the Class all direct and consequential damages authorized by law;

(f)     Order that all Defendants abate the nuisance and pay compensatory damages and other damages for harms caused by the nuisance;

(g)     Order that the Chinese Government Defendants, the Communist Party, and the Laboratory Defendants cease engaging in the abnormally dangerous activities, reimburse the cost of the State's abatement efforts, and pay compensatory and other damages for harms caused by the abnormally dangerous activities;

(h)     Awards Plaintiffs and the Class punitive damages against Defendants;

(I)     Awards Plaintiffs and the Class all reasonable costs attributable to the prosecution of this civil action authorized by law;

(j)     Awards Plaintiffs and the Class all pre-judgment interest authorized by law; and

(k)     Awards Plaintiffs and the Class such further relief as the Court deems just and appropriate.

Respectfully submitted, this 14 day of May 2020.

/s/ James Barrett Wilson
JAMES BARRETT WILSON, JR.
NC State Bar 18752
411 Waughtown Street
Winston-Salem, NC 27127
Phone: (336) 773-0059
Fax:    (336)773-0061
Email: james@jbwilsonlaw.com
Attorney for Plaintiffs